COURT OF
APPEALS

                                                    EIGHTH DISTRICT
OF TEXAS

                                                               EL
PASO, TEXAS

 

THELMA LOVE, As
Administrator of the             )

Estate of ELEASE PORTER,
Deceased, and         )

WILLIE PORTER,                                                )

                                                                              )            No.  08-00-00297-CV

Appellants,                         )

                                                                              )                 Appeal from the

v.                                                                           )

                                                                              )              
160th District Court

C F & H CORPORATION
d/b/a SOUTH            )

DALLAS NURSING HOME and
LEONA           )           of Dallas County,
Texas

HAWKINS,                                                          )

                                                                              )           
(TC# DV98-04874-H)

Appellees.                          )

                                                                              )

                                                                              )

 

O
P I N I O N

 

Appellants Thelma
Love and Willie Porter (ALove@) appeal from the jury=s verdict failing to find gross
negligence against Appellees C F & H Corp. d/b/a
South Dallas Nursing Home and Leona Hawkins (ANursing
Home@).  Love brings a single issue on appeal:  (1) The jury=s failure to find gross negligence is
against the great weight and preponderance of the evidence.  We affirm.

SUMMARY
OF THE EVIDENCE








On December 22,
1997, Elease Porter (APorter@) was struck by a car on a freeway and
killed immediately.  Love, the
administrator of Porter=s
estate, and Willie Porter, one of Porter=s
sons, brought suit for wrongful death against the Nursing Home, where Porter
had been staying.  The jury found that
the Nursing Home was negligent but not grossly negligent.

Elease Porter

Porter suffered
from Alzheimer=s and
schizophrenia.  Her
symptoms ranged from confusion and disorientation, hallucination, agitation,
and wandering.  Up to 1987, Porter
lived with her brother, but when he passed away, Porter=s
nephew, Love=s
husband, and Love decided to let Porter live with them.[1]

Although Love was
aware that Porter suffered from schizophrenia, she said that Porter was very
quiet and caused no problems for the first few years until she began
wandering.  Love testified that the
wandering manifested only when she began working and Porter was left alone in
the house.

Unable to
safeguard Porter=s
well-being, Love placed her at a nursing home. 
However, the nursing home was unable to protect Porter against her
wandering, and a different nursing home had to be found.  Love and her husband decided on the South
Dallas Nursing Home, because it was closer to their home, facilitating visits,
and the Nursing Home reassured them that it could handle Porter=s wandering.

The Nursing Home=s record of the nurses= notes showed that Porter left the
facilities of the Nursing Home about twenty times from August 1, 1997 to
December 22, 1997.  The record shows that
the Nursing Home tried to transfer Porter in November and December of 1997, but
was unable to do so before the fatal accident on December 22, 1997.








The
Nursing Home

The Nursing Home
is located in South Dallas, adjacent to the Central Express freeway.  It housed several residents afflicted with
Alzheimer=s and a
tendency to wander.  At the time of the
trial, there were around eight or ten such residents at the Nursing Home.  The Nursing Home knew which residents
wandered and that Porter had a tendency to wander.

Leona Hawkins has
been the administrator for the Nursing Home, owned by the C F & H Corp.
since 1971.  Leona Hawkins and Sandra Broden (Hawkins=
daughters), Stanley Kaufman, and Yvonne Hervey are C
F & H=s
officers.  From 1993 through 1995,
Hawkins remodeled the facility and also added an alarm system at every outside
exit door in the building.  She was
unaware of other kinds of systems at the time. 
Hawkins wished to add a fence around the building, but the City of
Dallas and other authorities informed her that the fence would not be allowed,
and she did not apply for a permit.

In addition to the
alarm system, to protect the Awanderers,@ the Nursing Home=s policy on difficult residents was to
talk and be with the patients or medicate them, but there was no specific
policy that Nurse Annie Forest was aware of. 
The Nursing Home also monitored its potential wanderers by checking on
them at least every two hours.  The
nurses on different shifts maintained notes on the residents and gave oral
reports to the nurses succeeding their shifts. 
Forest stated that they filled out incident reports when a resident
wandered and reached the street or fell and hurt themselves but never when they
just walked outside.[2]








On December 11,
1997, Marie Konechy, a registered surveyor for the
Texas Department of Human Services (AHuman
Services@),
investigated the Nursing Home because of an anonymous complaint of insufficient
staff and the residents=
wandering due to the staff=s
negligence.  During her investigation, Konechy looked at incident reports to aid her in evaluating
the Nursing Home.  She found two incident
reports of a resident wandering from the Nursing Home, and concerned, she
reviewed his chart.  She discovered from
the chart that there were at least two other incidents of this resident=s wandering that had not been reported,
totaling at least four occasions when the resident had wandered.  When she asked Hawkins=
daughter, the acting director of the Nursing Home, whether there were any other
residents who had wandered and about whom no incident reports had been made on
their wandering, Hawkins=
daughter said there were no other such residents.  The wandering resident was transferred out of
the Nursing Home, because it was not adequately equipped to protect him from
his wandering.

Rhonda Jones, a
social worker and Hawkins=
granddaughter, testified that on December 22, 1997, she had been trying to Aplace@
Porter at a different facility.  Her
notes showed in detail that she called Cedars Hospital on that day to inquire
about medicating Porter and indicating the Nursing Home would take her back.[3]  Jones said that because the other facilities
would not be available quickly, she had been calling psychiatric hospitals for
admission.

 








The
Fatal Accident

On December 22,
1997, Nurse Forest came on duty and received the report from the nurse on the
previous shift.  Porter had been agitated
and wanting to leave the building and had left it at least once that day.  That afternoon, after Porter had tried to
leave or actually left at 10 a.m., 2 p.m., and 3 p.m., the Nursing Home
placed Porter in a geri-chair to restrain her.  Jones thought that Porter should be placed in
a different facility for evaluation, and they contacted a doctor for medication
to help calm Porter=s
agitation.  At 4:30 p.m., Forest gave
Porter fifty milligrams of Vistaril for the
agitation.

The cook at the
Nursing Home, Lizzie Traylor, said that she remembered Porter in the dining
room at around 5 p.m. on December 22, 1997. 
She said Porter was eating and singing. 
She had been allowed out of the geri-chair to
eat.

Hawkins testified
that around the Christmas holidays, the Nursing Home had lots of traffic from
civic and Christian organizations visiting, and the alarm at the front door was
left off because of traffic flow.  She
thought that Porter probably walked out with other people who were leaving the
facility at the time.[4]

At around 5:30
p.m. on December 22, 1997, Traylor went outside to move her truck and saw
Porter in the middle of the freeway. 
Traylor said that Porter smiled and then started to run off.  Traylor was chasing Porter when a car ran
over her.








It was just
getting dark, around 5:30 p.m. as Robin Thompson was driving on the Central
Expressway with his brother Kevin, when the cars in front of him began braking
at the Pine Street exit, just in front of the Nursing Home, and Robin and Kevin
saw something fly up in the air.  Robin
pulled over after his brother said that a person had been struck then called
911 before checking for vital signs on the body.  He said that some people came over about five
minutes after the impact and identified her as AMs.
Hattie.@  The people said they were from the Nursing
Home and had been looking for her.  
Kevin said that the people kept on repeating that they had been chasing
her.

Senior Corporal
Lisa Melgoza of the Dallas Police Department
testified that Porter had been struck but not run over by a vehicle.  She said that the vehicle tried to brake, did
a nose-dive while braking, and struck Porter=s
legs on her right side first before she was thrown up on the hood to hit the
windshield with the left side of her head and being vaulted to the driver=s side of the car.  Porter=s
legs were first broken by the vehicle, then her ribs, and death caused probably
by damage to her lungs and the aorta.

The
Investigation of the Human Services








Simon Polisky of the Texas Department of Human Services
investigated Porter=s
death.  He determined that Porter had a
history of wandering and had physically left the Nursing Home facility
approximately twenty times between August 1, 1997 and December 22, 1997.[5]  The investigator also found that the Nursing
Home relied on an alarm system and monitoring every two hours plus medication
to control Porter=s
wandering.  Coupled with the Nursing Home=s failure to fill out incident reports
on Porter=s series
of wandering since August 1997 and failure to supervise adequately, this posed
a threat to the health and safety of the residents, the Human Services
investigator reported.

Polisky said that had incident reports been properly filled
out, then it would have been available for the Human Services to determine the
existence of a problem and require different action from the Nursing Home than
what it had been doing.

The trial was
heard before a jury from February 9, 2000 through February 11, 2000.  The jury found that the Nursing Home was
negligent but not grossly negligent and awarded damages in the following
amounts:  $4,031.24 (pain/mental anguish;
funeral and burial expenses) and $5,000 (future suffering).  The trial court then assessed against the
Nursing Home $9,031.24 in compensatory damages, $891.67 in prejudgment
interest, and $2,262.20 in costs.








Love challenges
the judgment of the trial court based on the sufficiency of the evidence and
misconduct of the jurors.  We will not
reach the issue of the jury misconduct, as she urges us to do, since we cannot
consider evidence of matters or statements occurring during jury
deliberations.  See Tex.R.Civ.P. 327(b); also see Golden Eagle
Archery, Inc. v. Jackson, 24 S.W.3d 362, 375 (Tex. 2000)(holding
Rule 327(b) is constitutional).

When the burden of
proof is by clear and convincing evidence, we apply a heightened factual
sufficiency standard of review.  In the Interest of B.R., 950 S.W.2d 113, 118-19 (Tex.App.--El Paso 1997, no writ).  After considering all evidence, we determine
whether the evidence was sufficient to produce a firm belief or conviction as
to the truth of the allegations sought to be established.  Id. at 119.  Only if the fact finder could not have
reasonably found the fact by clear and convincing evidence will the factual
sufficiency point of error be sustained.  Id. 
It is not our province to interfere with the jury=s
resolution of the conflicts in the evidence or to weigh the credibility of the
witnesses and their testimony.  Reynolds v. Kessler, 669 S.W.2d 801, 807 (Tex.App.--El Paso 1984, no writ).  Generally, a jury=s
resolution of the conflicts in the evidence is conclusive.  Clark v. Nat=l Life & Accident Ins. Co., 200
S.W.2d 820, 822 (Tex. 1947).








For a claimant to
recover exemplary damages in an wrongful death action,
a wilful act, omission, or gross neglect must be
proven by clear and convincing evidence. 
Tex.Civ.Prac.&Rem.
Code Ann. '
41.003(a)(3) & (b)(Vernon 1997). 
Gross negligence has both objective and subjective components.  Transp. Ins. Co. v. Moriel, 879 S.W.2d
10, 21-2 (Tex. 1994).  As viewed
objectively, the conduct at issue must have created an Aextreme
degree of risk.@  Id. at 22.  Considering the magnitude and probability of
the potential injury, a mere remote possibility is not enough; a likelihood of
serious injury must have been created.  Id.  The subjective component of gross negligence
demands that the defendant had an actual, subjective awareness of the risk of
harm to others and proceeded to act in conscious indifference to that risk.  Id. at 23.  Evidence of simple negligence will not
satisfy the burden of proof, which may not be shifted to the defendant.  Tex.Civ.Prac.&Rem.Code Ann. ' 41.003(b).

The evidence shows
that the Nursing Home was aware of Porter=s
propensity to wander and that she had wandered from the facility at least
twenty times between August 1, 1997 and December 22, 1997, sometimes as
many as three times in a day.  The
administrator of the Nursing Home said that in spite of their monitoring and
alarms on the doors, on the day of the accident, Porter was able to leave the
facility by walking out with large groups of visitors to the Nursing Home, when
the alarm was left off.  Such an incident
had occurred at least once before, on October 12, 1997, when another resident
wandered off with a visiting church group.

The Nursing Home
was aware that its facility and policy was inadequate, since Porter was able to
leave the facilities, the Nursing Home knew how she usually was able to do so,
and the Human Services=
determination of its inadequacy in early December 1997.  Moreover, Rhonda Jones testified that the
Nursing Home was trying to transfer Porter in November 1997.  On the very day that Porter was killed, Jones
had been trying to place Porter in another facility or at least a psychiatric
hospital.








The evidence is
troubling.  The Nursing Home plainly had
inadequate facilities to monitor Porter=s
wandering and was aware of that risk. 
However, whether it acted or omitted to act in conscious indifference to
that risk is debatable.  The Nursing Home
was seeking to place Porter in a different facility at least as of November
1997; that it did not succeed in doing so is not a clear and convincing
indication of conscious indifference to the risk that Porter would wander and
be injured.  The jury had the power to
weigh the evidence and did not choose to find the Nursing Home acted with gross
negligence.  We cannot say that the
evidence is such that the jury unreasonably refused to find gross negligence by
clear and convincing weight of the evidence. 
We overrule issue one.

The judgment of the
trial court is affirmed.  

 

 

August
22, 2002

DAVID WELLINGTON
CHEW, Justice

 

Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.

 

(Do Not Publish)











[1]
Porter=s son,
Willie Porter, is mentally handicapped and lived with his mother until she had
to go into a nursing home.  He tried to
find his mother and cousins, the Loves, but could not remember where they lived
or the nursing home.  He is aware that
his mother is dead and is depressed about it.  
Porter has two other sons, who did not support or visit her while she
was in the Nursing Home.





[2]
The administrator of the Nursing Home testified that the Human Services
required an incident report only if a patient had left the facility for eight
hours.  An investigator for the Human
Services however testified that an incident report would be required whenever a
person left the facility, not when the resident had left for eight hours.





[3]
Counsel for the Appellants pointed out at trial that the only such detailed
notes were on December 22, 1997, while the records beginning in 1996 (when
Jones began working at the Nursing Home) up to December 1997 have no time or
detailed notes.





[4]
The occurrence seems to have been frequent. 
The nurses=
notes of the Nursing Home used this explanation as to how residents had
wandered from the building on other occasions. 
Love testified that the Nursing Home had told her that Porter had walked
out with a church group when Porter had been missing before and police had to
be called.





[5]
The Human Services investigator gave as examples:

 

August
3, 1997:            5 a.m., Police called
when Porter could not be located and returned by the police at 7 a.m.

10 a.m., Porter leaves facility
again.

September
13, 1997:    7:45 a.m., resident reached
Central Expressway and Pine Street before staff retrieved her.

September
18, 1997:    9:45 a.m., resident returned
by an automobile from the location of Central Expressway and Metropolitan.

November
4, 1997:      11:35 p.m., resident runs
outside to Metropolitan before staff retrieves her.

December
22, 1997:     10 a.m., resident leaves and
it takes four people to return her.

3 p.m., resident leaves and it takes three people to return
her.